IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| LUNSFORD DOLE PHILLIPS, | ) | CV. NO. 06-00402 DAE-BMK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| DOWNTOWN AFFORDABLES, | ) | |
| LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## ORDER GRANTING DEFENDANT'S PARTIAL MOTION FOR SUMMARY JUDGMENT

On September 4, 2007, the Court heard Defendant Downtown

Affordables, LLC's ("Downtown Affordables" or "Defendant") Partial Motion for

Summary Judgment.  Shawn A. Luiz, Esq., appeared at the hearing on behalf of

Plaintiff; Kelly G. LaPorte**,** Esq., appeared at the hearing on behalf of Defendant.

After reviewing the motion and the supporting and opposing memoranda, the Court

GRANTS Defendant's Motion.

## BACKGROUND

On July 25, 2006, Plaintiff filed a Complaint, alleging violations of

the Fair Housing Amendments Act of 1988 ("FHAA"), 42 U.S.C.

§ 3604(f)(3)(C)(iii)(IV), for failing to design and to construct usable kitchens in a

251-unit residential, condominium building located at 215 North King Street in Honolulu, Hawaii ("condominium building"). (Complaint ¶¶ 5-6.) Defendant is the owner of the condominium building. According to the declaration of Allison Mizuo Lee, an associate at Cades Schutte, LLP, during a meeting held on September 28, 2006 at the offices of Cades Schutte, Plaintiff clarified that his claims were based on the sufficiency of the clearance space between the refrigerators and the opposing counters in the kitchens of the condominium building. After Plaintiff obtained counsel in April 2007, however, Plaintiff filed a First Amended Complaint on July 27, 2007, alleging additional violations of the FHAA and class action complaints on the behalf of a class of similarly situated persons with disabilities. Despite the additional claims, the claim contained in paragraph 12(b) of the First Amended Complaint is the only claim at issue here, i.e., the sufficiency of the clearance space between the refrigerators and the opposing counters in the kitchens of the condominium building.

According to Plaintiff's First Amended Complaint, Plaintiff is an individual whose disability requires the use of a wheelchair. Plaintiff resides in a single, family house in Kailua, which he has owned for over ten years. In 2006, Plaintiff viewed several units in the condominium building during open houses. (First Amendment Complaint at ¶ 8-9.) During the showings, he found the

2

distance between the refrigerators in the kitchens and the opposing counters to be less than 40 inches, removing the kitchens from the "safe harbor" provision under the FHAA, 42 U.S.C. § 3604(f)(4).  In 2007, Plaintiff returned to the condominium building for another open house with a person who was knowledgeable about the FHAA's design and construction requirements.  While there, they apparently found other non-complying components, which are not at issue here.  (Id. at ¶ 12.)

The record reflects that Plaintiff has not rented or purchased a unit in the condominium building, nor has he alleged any facts that would indicate that he has placed an offer on a unit there.  Rather, Plaintiff seeks "the opportunity to include the [condominium building] as a possible rented or owned residence."  (Id. at ¶ 7.)  Kenneth Matsuura ("Matsuura"), a member of Downtown Affordables, has declared that third-party residents who are not before this Court privately own and/or occupy all of the 251-units in the condominium building.

The kitchen floor plan for the units demonstrates that there are 71 inches between the back wall of the space allotted for the refrigerator and the opposing counter.  Matsuura and Kazuo Yato ("Yato"), an architect for Downtown Affordables in connection with the condominium building, confirmed that measurement and design.  Based on that measurement, a refrigerator with a total

3

depth of 31 inches would provide the clearance necessary to fall within the FHAA's safe harbor provision, leaving 40 inches of clearance space.

According to Frank Leslie ("Leslie"), the broker for the marketing and sales of units in the condominium building, and Leonard Ciufo ("Ciufo"), the owner of the company that provided appliances for the units in the condominium building, the refrigerator model (Amana Model No. SBD20S4) originally selected for the kitchens in the units was discontinued before completion of the condominium building.  The depth of that refrigerator without the door handles was roughly 26 5/8 inches.[1]  As a result, Leslie's company conducted a survey of actual buyers of the units, which indicated that the buyers would prefer a larger refrigerator with a greater depth as a replacement model.  The refrigerator chosen was the Frigidaire Model FRS3R3E ("Frigidaire"), which Ciufo's company chose as a comparable replacement.  The Frigidaire with the handles has an advertised total depth of 33 7/8 inches and a depth of 28 ½ inches without the handles. Plaintiff's retained expert in accessibility issues, Bill Hecker ("Hecker"), contradicts that measurement.  Hecker declares that he measured the distance between the refrigerator without the handles (presumably the Frigidaire) and the face of the opposing base, finding a difference of 34 ½ and 36 inches.  The record

---

[1]     Information about the depth with the door handles is not available.

is not clear about whether the door handles would interfere with Plaintiff's

clearance and, thus, should be considered in the measurement.

On June 29, 2007, Defendant filed the instant motion, seeking

summary judgment on the allegation concerning the distance between the

refrigerator and the opposing counter.  On August 17, 2007, Plaintiff opposed the

motion, and on August 24, 2007, Defendant filed its reply.

STANDARD OF REVIEW

Rule 56 requires summary judgment to be granted when "the

pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.

Civ. P. 56(c); see also Porter v. California Dept. of Corrections, 419 F.3d 885, 891

(9th Cir. 2005); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

A main purpose of summary judgment is to dispose of factually unsupported

claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to

demonstrate facts to establish what will be an essential element at trial.  See id. at

323.  A moving party without the ultimate burden of persuasion at trial–usually,

but not always, the defendant–has both the initial burden of production and the

5

ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire &
Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden
initially falls upon the moving party to identify for the court those "portions of the
materials on file that it believes demonstrate the absence of any genuine issue of
material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d
626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

    Once the moving party has carried its burden under Rule 56, the
nonmoving party "must set forth specific facts showing that there is a genuine
issue for trial" and may not rely on the mere allegations in the pleadings.  Porter,
419 F.3d  at 891 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256
(1986)).  In setting forth "specific facts," the nonmoving party may not meet its
burden on a summary judgment motion by making general references to evidence
without page or line numbers.  S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885,
889 (9th Cir. 2003); Local Rule 56.1(f) ("When resolving motions for summary
judgment, the court shall have no independent duty to search and consider any part
of the court record not otherwise referenced in the separate concise statements of
the parties.").  "[A]t least some 'significant probative evidence'" must be
produced.  T.W. Elec. Serv., 809 F.2d at 630  (quoting First Nat'l Bank of Ariz. v.
Cities Serv. Co., 391 U.S. 253, 290 (1968)).  "A scintilla of evidence or evidence

that is merely colorable or not significantly probative does not present a genuine

issue of material fact." <u>Addisu</u>, 198 F.3d at 1134.

When "direct evidence" produced by the moving party conflicts with

"direct evidence" produced by the party opposing summary judgment, "the judge

must assume the truth of the evidence set forth by the nonmoving party with

respect to that fact." <u>T.W. Elec. Serv.</u>, 809 F.2d at 631.  In other words, evidence

and inferences must be construed in the light most favorable to the nonmoving

party.  <u>Porter</u>, 419 F.3d at 891.  The court does not make credibility determinations

or weigh conflicting evidence at the summary judgment stage.  <u>Id.</u>  However,

inferences may be drawn from underlying facts not in dispute, as well as from

disputed facts that the judge is required to resolve in favor of the nonmoving party.

<u>T.W. Elec. Serv.</u>, 809 F.2d at 631.

## DISCUSSION

Plaintiff argues that he cannot maneuver around the kitchens in the

condominium building units with the reduced clearance space that has resulted

from Defendant's decision to install the Frigidaire as a replacement refrigerator for

the original model.  He contends that because the Frigidaire provides for a

clearance of less than 40 inches as required to meet the safe harbor provision,

Defendant is in violation of the FHAA.  <u>See</u> 42 U.S.C. § 3604(f)(3)(C)(iii)(IV); 42

U.S.C. § 3604(f)(4); American National Standards Institute ("ANSI") A117.1; 56 Fed. Reg. 9511.

Defendant responds that because the kitchens in the units contain features of adaptive design, which would allow Defendant to maneuver about the space without structural modification or renovation, Defendant is not liable under the FHAA.  Defendant further argues that the Court should not consider Plaintiff's new argument, raised in his opposition, of intentional discrimination based on violations of the FHAA.

Preliminarily, the Court will not consider any claims of intentional discrimination raised for the first time in Plaintiff's opposition.  Generally, a plaintiff may not raise additional claims in his response to a motion for summary judgment.[2]  See Kaiser v. First Hawaiian Bank, 30 F. Supp. 2d 1255, 1261 n.3 (D. Haw. 1997); see also Grayson v. O'Neill, 308 F.3d 808, 817 (7th Cir. 2002) (citing Shanahan v. City of Chicago, 82 F.3d 776, 781 (7th Cir. 1996)).  Here, Plaintiff pled discriminatory practices under the FHAA, but he did not plead any facts of

---

[2]      Whether Plaintiff in fact intends to raise an additional claim of intentional discrimination in his opposition is not entirely clear, as Plaintiff alludes to such discrimination without specifically raising it as a claim.  (Opposition at 3.) Notwithstanding that lack of clarity, to the extent that Plaintiff seeks to argue intentional discrimination as a new claim, the Court shall not consider that argument.

intentional discrimination in his Complaint or his First Amended Complaint.  That Plaintiff filed his initial Complaint <u>pro se</u> is of no import.[3]   <u>See</u> <u>Brownlee v. Burleson</u>, No. CIV S-04-1330, 2006 WL 2354888, at *4 n.2 (E.D. Cal. Aug. 15, 2006) (declining to address additional claims brought by a <u>pro se</u> prisoner in his response to defendant's  motion for summary judgment because they were not alleged in the prisoner's complaint, nor did the prisoner seek leave to amend his complaint).  Even if the Court were to grant leeway to <u>pro se</u> plaintiffs filing complaints, Plaintiff was represented by counsel when he filed his First Amended Complaint.  The Court, therefore, shall not consider any new arguments raised for the first time in Plaintiff's opposition.

Plaintiff complains that the kitchens in Defendant's units violate the FHAA, 42 U.S.C. § 3604(f), which prohibits discrimination in the sale, rental, unavailability, or denial of a dwelling based on a handicap.   Subsection 3604(f)(3) defines discrimination as including, for purposes of that subsection:

> (C) [discrimination] in connection with the design and construction of covered multifamily dwellings for first occupancy after the date that is 30 months after September 13, 1988, a failure to <u>design</u> and <u>construct</u> those dwellings in such a manner that–

---

[3]     The Court notes that Lunsford Dole Phillips, Plaintiff, is in fact an attorney.

(iii) all premises within such dwellings contain the following features of <u>adaptive design</u>:

(IV) usable kitchens and bathrooms such that an individual in a wheelchair can <u>maneuver about the space</u>.

(Emphasis added.)  42 U.S.C. § 3604(f)(4) of the FHAA provides:  "Compliance with the appropriate requirements of the American National Standard for buildings and facilities providing accessibility and usability for physically handicapped people (commonly cited as 'ANSI A117.1') suffices to satisfy the requirements of paragraph (3)(C)(iii)."  In turn, ANSI A117.1 provides: "Clearance between all opposing base cabinets, counter tops, appliances, or walls within kitchen work areas shall be 40 inches (1015 mm) minimum."  <u>See also</u> 56 Fed. Reg. 9511 ("Usable kitchens would meet section [24 C.F.R. §] 100.205(c)(3)(iv) if: . . . Clearance between counters and all opposing base cabinets, countertops, appliances or walls is at least 40 inches.")   Although the ANSI standards are not mandatory, meeting those standards will ensure compliance.  <u>See</u> H.R. Rep. 100-711, at 27 (1988), <u>reprinted in</u> 1988 U.S.C.C.A.N. 2173, 2188 (noting that designers need not follow the standards in ANSI A117.1 exclusively if local or state standards or other creative methods would satisfy compliance).

There is no dispute that a 40-inch clearance space between counters and appliances would provide the requisite clearance space for Plaintiff.  There is a

10

dispute, however, regarding the clearance space available to Plaintiff with the

placement of the Frigidaire.  Plaintiff declares that the units contain 34 ½ and 36

inches of clearance space (without including the refrigerator handle in the

measurement), outside of the FHAA's safe harbor provision, while Defendant

claims that Plaintiff would have over 40 inches of clearance space based on a depth

(including the door and excluding the handles) of 29 7/8 inches, which does not

exceed 31 inches.

The Court is not entirely clear on how Plaintiff's expert, Hecker,

reached his calculation, as the Frigidaire's advertised measurement indicates a

depth of 28 ½ inches without the handles.  The starting measurement of 71 inches

between the back wall of the space allotted for the refrigerator and the opposing

base counter minus 28 ½ inches does not equal 34 1/4 and 36 inches.  Even if

Hecker had subtracted the Frigidaire's total depth of 33 7/8 inches with the handles

from 71, those numbers still would not result.  Despite the issue of fact

surrounding that measurement and that surrounding inclusion of the handles in the

measurement (which depends on whether the handles, in fact, interfere with

Plaintiff's clearance), the Court finds that those issues do not control the result here

because the kitchen was "designed" and "constructed" to contain appropriate

features of "adaptive design" in compliance with the FHAA, 42 U.S.C.

§ 3604(f)(3)(C)(iii).

Courts must "giv[e] effect, if possible, to every clause and word of a

statute," while viewing the language in the context of the statutory provision as a

whole.  In Re County of Orange, 262 F.3d 1014, 1019 (9th Cir. 2001) (citation and

internal quotation marks omitted); Turtle Island Restoration Network v. United

States, 438 F.3d 937, 943 (9th Cir. 2006).  Where statutory language is ambiguous,

courts may look to the legislative history behind the statute to discern

congressional intent.  See Amalgamated Transit Union Local 1309, AFL-CIO v.

Laidlaw Transit Servs., Inc., 435 F.3d 1140, 1144 (9th Cir. 2006); Long Beach

Banana Distr., Inc. v. Atchison, Topeka & Santa Fe Ry. Co., 407 F.2d 1173, 1180

(9th Cir. 1969) ("Where . . . the statutory term is not defined in the Act, the term

should be given that meaning which comports with the intent of Congress.")

Courts also may look to "the use of the term in practice," United States v. Ramirez,

347 F.3d 792, 799 (9th Cir. 2003), and dictionary definitions, Johnson v. Aljian,

490 F.3d 778, 780 (9th Cir. 2007), to construe the terms "in accordance with [their]

ordinary, contemporary, common meaning."  Cabazon Bank of Mission Indians v.

Smith, 388 F.3d 691, 698 (9th Cir. 2004) (citation and internal quotation marks

omitted).

The FHAA does not define the terms "design," "construct," or "adaptive design"; thus, the Court must look to other sources to determine Congress's intent. See 42 U.S.C. § 3602; 24 C.F.R. § 100.201. Dictionaries define the term "design," generally, as "[a] plan or scheme," Black's Law Dictionary 478 (8th ed. 2004), and, specifically, as "a scheme for the construction, finish, and ornamentation of a building as embodied in the plans, elevations, and other architectural drawings pertaining to it." Webster's Third New International Dictionary 611(5b) (1986).[4] Dictionaries define the term "construct" as "to form, make, or create by combining parts or elements," Webster's Third New International Dictionary 489(2), and "construction" as "[t]he act of building by combining or arranging parts or elements; the thing so built." Black's Law Dictionary 332. Based on those basic definitions, the "construction" of a kitchen likely would not include a choice of refrigerators, whereas the design of a kitchen may include such a choice as part of its scheme for the finish and ornamentation of the kitchen. The latter would depend on the common meaning of the term "design" in the practice, which could be clarified through expert testimony. For instance,

---

[4]      Courts may "look to how the terms were defined at the time [the statute] was adopted." Johnson, 490 F.3d at 780. The FHAA was enacted in 1988 and became effective in 1989; thus, a 1986 definition would provide an accurate definition of the term. See 56 F.R. 3232-01.

13

expert testimony could clarify that design schemes generally include the decision of which appliances to install to finish the kitchen and to complement its ornamentation.  Or, expert testimony could clarify that the design scheme does not include such a choice, as appliances generally are not part of a design consideration.  Whether the choice of a refrigerator constitutes part of the kitchen design to make it usable "such that an individual in a wheelchair can maneuver about the space," 42 U.S.C. § 3604(f)(3)(C)(iii)(IV), therefore, creates a question of fact that cannot be determined at this stage.

Notwithstanding, a failure to design a kitchen, including the choice of an appropriate refrigerator, in such a manner as to limit an individual's ability to maneuver around it only would constitute a violation of the FHAA if the design is not adaptable.  In other words, all units must contain features of adaptive design, the failure of which would constitute a violation of the FHAA.  Thus, the Court must determine whether the term "adaptive design" would include the placement of a refrigerator with an appropriate depth in a kitchen unit to make that area usable for individuals in wheelchairs.

A House Report indicates that the FHAA generally contemplates providing persons with mobile impairments the ability "to get into and around a dwelling unit."  H.R. Rep. 100-711, at 18.  That means, <u>inter alia</u>, that "disabled

persons should be able to easily make additional accommodations if needed, such as installing grab bars in the bathroom, without major renovation or structural change." Id. The House Report further indicates that the Judiciary Committee ("Committee") that considered the FHAA specifically chose not to impose a standard of "total accessibility" to "require that every entrance, doorway, bathroom, parking space, and portion of buildings and ground be accessible." Id. at 26. Rather, the Committee chose "to use a standard of 'adaptable' design, a standard developed in recent years by the building industry and by advocates for handicapped individuals to provide usable housing for handicapped persons without necessarily being significantly different from conventional housing." Id.

The fourth feature of adaptable design that deals with kitchens provides that a kitchen must constitute a "living environment usable by all," which on its face might suggest that kitchens must contain refrigerators of an appropriate depth so as not to interfere with the living space. Id. at 27. Nonetheless, the House Report clarified that an adaptable kitchen design "does not necessarily require that a turning radius be provided in every situation," and it "does not require that fixtures, cabinetry or plumbing be of such design as to be adjustable." Id. Rather, contrary to common misconceptions, "[t]ruly adaptable units can be adjusted or adapted without renovation or structural change because the basic accessible

15

features like door widths and ground level entrance are already part of the unit."
Barrier Free Environments, Inc., Department of Housing and Urban Development
Office of Policy Development and Research, Adaptable Housing 8 (1987)
(hereinafter "Adaptable Housing Manual"); H.R. Rep. 100-711, at 27 (citing
Adaptable Housing Manual); see also Baltimore Neighborhoods, Inc. v. Rommel
Builders, Inc., 40 F. Supp. 2d 700, 707 (D. Md. 1999) ("The purpose of adaptive
design is thus to design and construct the actual units in such a way that they have
basic accessible features for disabled persons without being any different from a
standard unit") (emphasis added).  That interpretation of adaptable units comports
with the Fair Housing Act's regulations that permit later adaptations or reasonable
modifications of existing premises.  See 24 C.F.R. § 100.203; 56 FR 9472-01,
9477.

Some non-structural adaptations that, if present, would not constitute
FHAA violations include such adaptations as "changing counter and sink heights;
removing a cabinet to reveal a knee space under the work surface, kitchen sink, and
bathroom lava[t]ory; and attaching grab bars if needed."  Adaptable Housing
Manual at 8.  Non-structural changes also may include appliance controls, such as
light and fan switches on range hoods.  See Montana Fair Housing, Inc. v. Am.
Capital Dev., Inc., 81 F. Supp. 2d 1057, 1067 (D. Mont. 1999).  Because building

maintenance staff, tenants, or owners could make those adjustments "without delaying occupancy," those adaptations would not expose one to FHAA violations. See id.  In sum, "[a]n adaptable unit is an accessible unit with features that can be tailored to the specific needs of the tenant."  Id. (emphasis omitted).

Considering whether features may be adjusted for the needs of a tenant does not mean that courts must look to "whether a particular dwelling meets the needs of a particular handicapped tenant."  United States v. Tanski, No. 04CV714, 2007 WL 1017020, at *15 (N.D.N.Y. March 30, 2007).  Instead, courts tend to view compliance based on an objective standard of adaptability, considering whether, objectively, a feature is adaptable, rather than a subjective standard based on the individual needs of a particular tenant.  See, e.g., Tanski, 2007 WL 1017020, at *14-15; Montana Fair Housing, Inc., 81 F. Supp. 2d at 1065 (concluding that "adaptable design" is a "term of art, meaning design appropriate for use by persons of all abilities without modification").  Thus, as the Tanski court found, the "anecdotal experiences of individual handicapped people" would not raise a material question of fact concerning the design and construction of a building in compliance with the FHAA.  See Tanski, No. 04CV714, 2007 WL 1017020, at *15.  Rather, the Court must analyze the objective adaptability of the feature at hand.

17

The cases in which courts have deferred to the 40-inch compliance standard in favor of the handicapped plaintiff have involved units with less than 40 inches of clearance space between structural boundaries, such as the kitchen counter and the opposite wall and the floor space parallel to and centered on the kitchen sink.  See, e.g., Memphis Center for Indep. Living v. Richard and Milton Grant Co., et al., No. 01-2069 D/A (attached as Plaintiff's Ex. C); United States v. Quality Built Constr., 309 F. Supp. 2d 767, 777 (E.D. N.C. 2003).  Such structural problems plainly constitute violations of the FHAA.  Those types of structural changes are not involved here.  Plaintiff basically complains that the chosen refrigerator does not permit him to maneuver around the kitchens in the condominium building units.  Replacing a refrigerator surely would not be considered more of a "structural" change than "changing counter and sink heights; removing a cabinet to reveal a knee space under the work surface, kitchen sink, and bathroom lava[t]ory; and attaching grab bars if needed," which have been defined as non-structural.  Adaptable Housing Manual at 8.  Comparing those "non-structural" adaptations to the proposed adaptation at hand, the proposed adaptation would not rise to the level of a structural change creating a violation under the FHAA.

Plaintiff appears to argue, however, that the proposed adaptation constitutes a renovation.  The Supreme Court of Hawaii has defined the term "renovation" to mean "to restore to good condition; make new or as if new again; repair."  Cho Mark Oriental Food, Ltd. v. K & K Int'l, 836 P.2d 1057, 1064 (Haw. 1992) (citing Webster's Encyclopedic Unabridged Dictionary of the English Language 1215 (1989) (emphasis added)).  That definition coincides with other dictionary definitions, such as "to restore to a former state (as of freshness, soundness, purity, or newness of appearance): make over: renew."  Webster's Third New International Dictionary 1923(2); see also State v. United Pac. Ins. Co., 18 P.3d 491, 493 (Or. App. Ct. 2001).  Restoring something to a former state, renewing, repairing, or making new or as new again does not encompass the replacement of an appliance, such as a refrigerator, which replacement can be accomplished without delaying occupancy and within a relatively short period of time (possibly even minutes).  If the back wall against which the refrigerator must be placed did not provide for enough space to permit clearance with a smaller, replacement refrigerator, then the kitchen adaptation may be considered structural.  Or, if smaller, replacement refrigerators were not manufactured or available, forcing a renovation of the back wall or other structural components of the kitchen, a violation of the FHAA may result.  Neither of those situations are what occurred

19

here, however.  Instead, the distance between the back wall and the opposing

countertop indisputably provides for 71 inches of space, making a reasonably sized

replacement refrigerator of 31 inches or less a feasible, adaptable design solution.

Based on the statutory language of the FHAA, the legislative history,

the Adaptive Housing Manual, available case law, and dictionary definitions of the

relevant terms, the Court finds that replacement of a refrigerator, where the

refrigerator easily could be replaced without delay with one that plainly would

comply with FHAA standards, falls within the features of an adaptive design.  As

the kitchens were designed and constructed with features of adaptive design

pursuant to the FHAA, Defendant is not in violation of the FHAA, 42 U.S.C.

§ 3604(f)(3)(C)(iii)(IV, for failing to design and to construct usable kitchens.  The

Court, therefore, GRANTS summary judgment on this issue.[5]

---

[5]     Alternatively, although Defendant did not make this argument in the
instant motion, reserving it and others for possible subsequent dispositve motions,
the Court finds that Plaintiff may lack standing.  To prove standing, Plaintiff must
show that he (1) has suffered an injury in fact (2) that is causally connected to the
defendants conduct and (3) that is likely to be redressed by a favorable ruling.  See
Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  Courts have applied
that same standard for violations of the Fair Housing Act.  See, e.g., Lincoln v.
Case, 340 F.3d 283, 289 (5th Cir. 2003); Hamad v. Woodcrest Condo. Ass'n, 328
F.3d 224, 230 (6th Cir. 2003); San Pedro Hotel Co., Inc. v. City of Los Angeles,
159 F.3d 470, 475 (9th Cir. 1998); Wilson v. Glenwood Intermountain Properties,
Inc., 98 F.3d 590, 593 (10th Cir. 1996); Comer v. Cisneros, 37 F.3d 775, 787 (2d
Cir. 1994).  Because the replacement of a refrigerator would not require renovation
(continued...)

<u>CONCLUSION</u>

For the reasons stated above, the Court GRANTS Defendant's

Motion.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, September 4, 2007.



_____
David Alan Ezra
United States District Judge


<u>Lunsford Dole Phillips vs. Downtown Affordables, LLC</u>, Civil No. 06-00402
DAE-BMK; ORDER GRANTING DEFENDANT'S PARTIAL MOTION FOR
SUMMARY JUDGMENT

---

[5](...continued)
or a structural change and it may be accomplished without delay, Plaintiff has
failed to demonstrate "that as a result of the defendant's [discriminatory conduct]
he has suffered a distinct and palpable injury."  <u>San Pedro Hotel Co., Inc.</u>, 159 F.3d
at 475.  Moreover, that Plaintiff has not rented, purchased, or made an offer for a
unit in the condominium building, according to the record before the Court, is a
standing concern that may be addressed at a later time.